UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JORGE CRUZ,
                                                    :
                    Plaintiff,                              06 Civ. 3670 (LTS) (DF)
                                                    :
         -against-                                         **REPORT AND**
                                                    :      **RECOMMENDATION**
MICHAEL J. ASTRUE, COMMISSIONER OF
SOCIAL SECURITY,[1]                                 :

                    Defendant.                      :
------------------------------------------------------------X

**TO THE HONORABLE LAURA T. SWAIN, U.S.D.J.:**

## INTRODUCTION

Plaintiff Jorge Cruz ("Plaintiff") seeks review of the final decision of Administrative Law

Judge Paul A. Heyman ("ALJ") in favor of Defendant, the Commissioner of Social Security

("Defendant" or the "Commissioner"), denying Plaintiff disability insurance benefits ("DIB")

and Supplemental Security Income ("SSI") under the Social Security Act (the "Act") on the

ground that Plaintiff's impairments do not constitute a disability for the purposes of the Act.

Defendant filed a motion pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for

judgment affirming the decision of the ALJ.  Plaintiff has neither responded to Defendant's

motion nor cross-moved.

For the reasons set forth below, I respectfully recommend that Defendant's motion for

judgment on the pleadings be granted.

---

[1] Michael J. Astrue, the current Commissioner of Social Security, took office as of
February 12, 2007; pursuant to Fed. R. Civ. P. Rule 25(d)(1), he was then automatically
substituted as defendant for his predecessor in office, Joanne B. Barnhart, who had been named
as defendant in Plaintiff's Complaint.

## PROCEDURAL BACKGROUND

On July 8, 2003, Plaintiff filed concurrent applications for disability insurance benefits under Title II of the Social Security Act, and Supplemental Security Income benefits under Title XVI of the Act. (R. 13, 55-58.)[2] Plaintiff alleged disabilities including hypertension, high cholesterol, a hernia, and diabetes, and Plaintiff alleged that he had become unable to work on or about May 19, 2003. (R. 55, 62.)[3] On February 18, 2004, the Social Security Administration denied both of Plaintiff's applications on initial administrative review. (R. 22-27.) On August 18, 2005, an administrative hearing was held before the ALJ, at which Plaintiff appeared with his representative and a Spanish interpreter. (R. 212.) The ALJ considered the case *de novo* and, on September 22, 2005, issued a decision finding that Plaintiff was not disabled. (R. 10-18.) The ALJ's decision became the final decision of the Commissioner on February 21, 2006, when the Appeals Council denied Plaintiff's request for review. (R. 5-7.) This action followed.

## FACTUAL BACKGROUND

Plaintiff was born on May 30, 1946, and was 58 years old at the time of the ALJ's decision. (R. 55.) Plaintiff testified that he was illiterate and had a first grade education. (R. 68, 100, 216.) Plaintiff was fluent in Spanish, but could not speak English. (R. 77, 215.) At the time of the administrative hearing, Plaintiff was unemployed and living with his daughter and girlfriend. (R. 215-16.) He had worked as a short-order cook for nearly 16 years. (R. 85.) His most recent position of employment, a short-order cook for Volume Services, Inc., had ended in

---

[2] "R" refers to the Record of the administrative proceeding.

[3] Plaintiff alleged an onset date of May 19, 2003 in his application but alleged an onset date of May 6, 2003 in his disability report. (*Compare* R. 55 *and* R. 62.)

May, 2003. (R. 74, 78, 85, 216-18.) The position required Plaintiff to stand at a grill and to make hamburgers and soups, and occasionally to lift up to 50 pounds. (R. 217.) Plaintiff indicated that his responsibilities at this job were eventually curtailed due to his "illness." (R. 78.) After the curtailment, his remaining responsibilities included washing dishes, cleaning counters, and peeling potatoes. (*Id*.) On May 19, 2003, Plaintiff allegedly became unable to work as a result of his claimed disabling condition. (R. 55.)

### A.      Plaintiff's Testimony at the Administrative Hearing

Plaintiff reported that he became unable to work due to hypertension, high cholesterol, a hernia, glaucoma, and diabetes. (R. 218.) Plaintiff testified that he was unable to work as a result of symptoms associated with these conditions, including severe headaches, dizzy spells, impaired vision, and pain caused by lifting. (R. 78, 218, 223-24.) Plaintiff testified that he was unable to see with his left eye and could see only "a little" with his right eye. (R. 219.) Despite this claim, Plaintiff had no trouble reading the time on a clock on the wall during his hearing. (*Id*.) Plaintiff further claimed to have had poor hearing. (R. 223.)

In terms of his physical abilities, Plaintiff stated that he was unable to lift "any weight," that he dropped objects because he had no strength in his hands, and that he was unable to walk more than one-half block. (R. 222.) Plaintiff further testified that he required help getting dressed, that he could stand for up to one-half hour at a time, and that he could sit for only two to three minutes. (R. 221-22.) Plaintiff stated that he did not use drugs, alcohol, or tobacco. (R. 221.)

### B.  Medical Evidence

#### 1.  Evidence Relating to Plaintiff's Medical
####     Condition Prior to the Alleged Onset of Disability

On April 20, 2001, Plaintiff was admitted to St. Barnabas Hospital ("St. Barnabas") for passing blood through his nose and mouth.  (R. 152-53.)  Plaintiff also complained of headaches and foot and shoulder pain. (R. 153.)  During his examination, Plaintiff appeared comfortable and maintained a blood pressure of 197/106.  (R. 154.)  The physician noted that Plaintiff had been diagnosed with hypertension one year earlier and that he had not been compliant with his prescribed medication or diet.  (R. 152-53.)  After being treated with medications,[4] Plaintiff was discharged in stable condition on April 22, 2001.  (R. 151.)  The examining physician diagnosed Plaintiff as having suffered a hypertensive emergency.  (*Id.*)  Plaintiff's blood pressure upon discharge was 150/90.  (*Id.*)

In late October of the same year, Plaintiff sought treatment at Montefiore Medical Center ("Montefiore") for light-headedness and headaches.  (R. 109-12, 122-25.)  At the hospital, Plaintiff indicated that he had had untreated hypertension for more than one year.  (R. 110.)  During his examination, Plaintiff's blood pressure was 200/120 for the right arm, and 210/120 for the left arm.  (*Id.*)  Plaintiff showed no signs of distress, and his gait, speech, and affect were normal.  (*Id.*)  Plaintiff's abdomen revealed no tenderness or abnormalities and his extremities had no swelling.  (R. 111.)  His neurological signs were also normal.  (*Id.*)  The examining

---

[4] The treating physician prescribed a low salt diet and medications, including Norvasc and aspirin.  (R. 151.)  Norvasc is "[t]he trademark name of a drug used in the treatment of hypertension and certain forms of angina."  4-N *Attorneys' Dictionary of Medicine* 3441.

physician's diagnostic impression was severe hypertension, and he prescribed Norvasc and Metoprolol.  (*Id.*)[5]

On November 1, 2001, Plaintiff returned to Montefiore for a follow-up examination.  (R. 113-14.)  During the examination, Plaintiff indicated that he was suffering from intermittent headaches, poor exercise tolerance, and decreased visual acuity.  (R. 113.)  He also complained of foot and right shoulder pain.  (R. 114.)  Plaintiff tested normal in a neurological exam and his blood pressure was 175/110.  (*Id.*)  The examining physician prescribed Norvasc and atenolol for Plaintiff's hypertension.  (R. 114.)[6]  The physician advised Plaintiff to perform stretching exercises to alleviate his complaints of foot pain and referred him to a rehabilitation clinic to treat his shoulder pain.  (*Id.*)

Plaintiff had another follow-up examination regarding his hypertension on February 13, 2002.  (R. 116-17.)  During the examination, Plaintiff complained of arm and shoulder pain, difficulty sleeping, and dizziness.  (*Id.*)  Plaintiff believed the dizziness was associated with taking his medication.  (R. 116.)  Plaintiff's blood pressure was 170/110 for the right arm and 180/110 for the left arm.  (R. 117.)  Plaintiff's abdomen, extremities, eyes, and neurological functioning all tested normal.  (*Id.*)  Although Plaintiff's muscle strength in his upper and lower extremities was rated as 5+ out of 5,[7] Plaintiff reported a loss of shoulder range of motion due to

---

[5] Metoprolol is "[a] drug used in the treatment of hypertension, angina pectoris, and myocardial infarction."  4-M *Attorneys' Dictionary of Medicine* 3930.

[6] Atenolol is "[t]he generic name of a medicinal substance used in the treatment of hypertension."  1-A *Attorneys' Dictionary of Medicine* 11828.

[7] Muscle strength usually is graded on a scale of 0 to 5, ranging from no movement (0) to normal movement (5).  *The Merck Manual of Diagnosis and Therapy* ("*Merck*") 1751 (18th ed. 2006).

pain.  (*Id.*)  The examining physician's diagnostic impression was that Plaintiff suffered from

hypertension, shoulder pain, and possibly sleep apnea.  (R. 117.)  He prescribed Tylenol for

Plaintiff's shoulder pain and referred him to a pulmonary clinic to evaluate the possibility of

sleep apnea.  (*Id.*)

On April 7, 2003, Plaintiff sought treatment for "pimples" on his scrotum.  (R. 131.)  An

examination revealed extensive idiopathic scrotal calcinosis, and the examining physician

referred Plaintiff to the urology department for further examination.[8]  (*Id.*)

On May 2, 2003, Plaintiff visited Montefiore to refill his medications and to check his

blood pressure.  (R. 118.)  He reported feeling well, and his blood pressure was 200/100 and

190/110 for his left and right arm, respectively.  (*Id.*)

### 2.    Evidence Relating to Plaintiff's Medical Condition Subsequent to the Alleged Onset of Disability

Plaintiff visited the Jacobi Medical Center for an eye examination on May 16, 2003.

(R. 137.)  The examination revealed hemorrhogeal exudates on Plaintiff's left eye.  (*Id.*)[9]  The

examining physician recommended a follow-up examination at the clinic to determine the cause

of the exudation.  (*Id.*)

On June 6, 2003, Plaintiff's scrotal skin condition was further examined at St. Barnabas

Hospital for clearance to perform a partial scrotectomy.  (R. 138-39, 140-42.)  During the

examination, Plaintiff complained of headaches lasting up to three days, blurred vision in his left

---

[8] Calcinosis is a condition in which there is an abnormal deposition of calcium salts in the tissue.  *The American Medical Association Encyclopedia of Medicine* ("*AMA*") 223 (Charles B. Clayman, M.D. ed., 1989).

[9] Exudation is the discharge of fluid from blood vessels on the tissue surface, which is usually the result of inflammation.  *AMA* at 428.

eye, chest pain after walking one block, radiating pain in his right leg and thigh, and diminished sensation in some of the toes of his right foot. (R. 138-39.) His blood pressure was 128/76, his eyes, extremities, muscle strength and gait were in normal condition, and he reported no back tenderness. (*Id*.) The report also indicated that Plaintiff suffered from hypertension and hernias. (*Id*.) The examining physician concluded that Plaintiff's hypertension was under "better control" with the aid of medication, which he recommended continuing. (*Id*.) The physician also concluded that Plaintiff had diabetes mellitus and elevated cholesterol, for which the physician recommended continuing metaformin and Zocor. (*Id*.)[10]

Plaintiff was eventually cleared for surgery and underwent a scrotectomy at North Central Bronx Hospital to remove calcified cysts on June 18, 2003. (R. 145-46.) Plaintiff indicated that the surgery went "well." (R. 136.) Plaintiff also indicated that he experienced some post-operative pain, but the physician reported no serious complications from the procedure. (*Id*.) At a post-surgical examination, Plaintiff's blood pressure was 120/68 and he denied any symptoms of blurry vision or dizziness. (R. 135-36.)

On August 14, 2003, Dr. Steven Rocker, a consulting internal medicine physician, examined Plaintiff. (R. 161-63.) Plaintiff stated (in Spanish) that he had suffered from "high blood pressure, cholesterol, diabetes, and hypertension for four years." (*Id*.) He also complained of headaches, although Dr. Rocker noted that the headaches were not associated with activity. (*Id*.) Plaintiff related that he took oral medication for his diabetes, but did not test his blood or urine for sugar at home. (*Id*.) Plaintiff did not complain of any visual impairment,

---

[10] Metaformin is "a medicinal substance which reduces the level of sugar in the blood." 4-M *Attorneys' Dictionary of Medicine* 3565. Zocor is "[t]he tradename of a medicine containing simvastatin, for use as an adjunct in the treatment of hypercholesterolemia (too much cholesterol in blood)." 6-Z *Attorneys' Dictionary of Medicine* 222.

numbness, renal disorder, chest pain or dyspnea (shortness of breath). (R. 161.) His musculoskeletal system was in normal condition. (R. 163.) Plaintiff showed no difficulty in transferring from a seated to a standing position. (R. 162.) He further demonstrated full use of both hands and arms in grasping and manipulating objects. (*Id*.) Plaintiff also exhibited a full range of motion in his joints. (R. 162-63.) In terms of his vision, Plaintiff's visual acuity was 20/200 in his right eye, uncorrected. (R. 163.) Plaintiff claimed to have had no vision in his left eye. (*Id*.) His blood pressure was 180/110. (R. 162.) The results of Plaintiff's neurological exam were normal, and he exhibited normal motor, sensory, cerebellar, and deep tendon reflex functioning. (*Id*.)

Dr. Rocker's report next discussed Plaintiff's social history and general condition. (R. 161-62.) Plaintiff denied cigarette smoking, alcohol or drug use. (R. 161.) Plaintiff also related that he had traveled to the examination by himself, that he lived at home with his mother, and that he spent most of his time sleeping and watching television. (*Id*.) Dr. Rocker noted that Plaintiff was slightly overweight, but well developed and well groomed, and that he showed normal affect and behavior. (R. 162.) In sum, Dr. Rocker opined that Plaintiff suffered from hypertension, diabetes mellitus (Type II), hyperlipidemia, a subjective visual impairment,[11] slight obesity, and illiteracy. (R. 163.) Based on the objective findings, Dr. Rocker further concluded that Plaintiff's condition was "fair" and that he could perform sedentary, light and moderate work activity. (*Id*.)

On September 30, 2003, Dr. Gene Matusow, an ophthalmologist at St. Barnabas Hospital, examined Plaintiff. (R. 164-65.) According to Dr. Matusow, Plaintiff complained of

_____

[11] Dr. Rocker noted that he did not find objective confirmation for any visual impairment but suggested that Plaintiff further consult with an ophthalmologist. (R. 13.)

8

blurred vision, but could not provide any known history of ocular disease, trauma, or surgery. (R. 164.) During the examination, Plaintiff's uncorrected visual acuity was 20/200 in his right eye and 20/80 in his left eye. (*Id.*) Plaintiff's best corrected visual acuity was 20/25 in his right eye and 20/40 in his left eye. (*Id.*) Dr. Matusow further noted that Plaintiff's field of vision was normal. (R. 165.) Although Dr. Matusow found evidence of diabetic retinopathy in Plaintiff's left eye,[12] the doctor's opinion was that Plaintiff suffered from no visual disability at the time of his examination. (*Id.*)

In December, 2003 and February, 2004, Dr. Gauthier, a non-examining review physician, reviewed the medical evidence on record to assess whether Plaintiff had a disabling impairment. (R. 170-72, 174-77.) Regarding Plaintiff's hernia, Dr. Gauthier observed that Plaintiff's allegations that the hernia prohibited him from lifting were only partially supported by the record. (R. 171.) Dr. Gauthier further noted that, although the examination on June 6, 2003 revealed the existence of bilateral hernias, there was "no associated report of pain or need for acute treatment." (*Id.*) The physician also indicated that the examination performed by Dr. Rocker on August 14, 2003 revealed that Plaintiff was fully ambulatory. (*Id.*) The record from the August 14, 2003 examination also showed that Plaintiff did not allege any pain or difficulty in moving associated with the hernia, his surgery to remove his scrotal calcinosis, or any other illness. (*Id.*) Additionally, Dr. Gauthier observed that Plaintiff's complaints of fatigue and dizziness were not associated with one illness, noting that these symptoms could be the result of "poorly controlled" diabetes and hypertension, due, in part, to Plaintiff's noncompliance

---

[12] Diabetic retinopathy is an eye condition characterized by increased capillary permeability, microaneurysms, hemorrhages, exudates and edema. If untreated, it can lead to blindness. *Merck* at 918-19.

with his medications.  (*Id*.)  Although Plaintiff suffered from retinopathy, most likely as a result of his diabetes, Dr. Gauthier found that Plaintiff's ophthalmological examinations did not support Plaintiff's allegations of poor vision.  (*Id*.)  Dr. Gauthier concluded that no physical limitations related to Plaintiff's vision had been established.  (*Id*.)

In terms of Plaintiff's cardiac health, Dr. Gauthier noted that there was no evidence of end-organ disease related to his hypertension.  (*Id*.)  There was some evidence, including an EKG and Plaintiff's complaints of shortness of breath while walking, that Plaintiff suffered from cardiac-related disease.  (*Id*.)  A subsequent echocardiogram, however, performed on February 2, 2004, did not confirm the possibility that Plaintiff suffered from hypertensive heart disease.[13]  (R. 174.)  Plaintiff had normal left ventricular size and function, normal right ventricular systolic pressure, and mild tricuspid regurgitation.  (R. 173.)[14]  It was Dr. Gauthier's impression that there was no evidence to support Plaintiff's claims of shortness of breath or his claims of exertional restrictions.  (R. 174.)

On April 4, 2004, Pamela Meserole, a nurse practitioner, prepared a report assessing Plaintiff's functioning in work-related activities.  (R. 184-87.)  Ms. Meserole's impression was that Plaintiff, in an eight-hour work day, could occasionally lift or carry up to 10 pounds, stand and/or walk for up to two hours, and sit for up to six hours.  (R. 184-85.)  She noted, however, that Plaintiff was incapable of performing any pushing or pulling, and that he could not balance, kneel, crouch, crawl, stoop or climb.  (R. 185.)  Moreover, Ms. Meserole opined that Plaintiff

---

[13] According to Dr. Gauthier, an echocardiogram is a "much more reliable" test than an EKG.  (R. 174.)

[14] Tricuspid regurgitation is "[t]he abnormal backflow of blood from the right ventricle (lower chamber of heart) into the right atrium because of a defective tricuspid valve (which is situated between the ventricle and atrium)."  6-TH-TY *Attorneys' Dictionary of Medicine* 545.

was limited in his gross and fine manipulation ability and his visual, auditory, and communicative functioning. (R. 186.) In support of her conclusions, Ms. Meserole cited Plaintiff's severe hypertension and his history of diabetes, high cholesterol, and impaired vision. (R. 185.)

Later in 2004, Dr. Chechik, Plaintiff's treating ophthalmologist, diagnosed a trace of diabetic retinopathy. (R. 190.) He further reported that this condition did not create any visual handicap or functional limitation with regard to environmental working conditions. (*Id.*) Dr. Chechik also opined that the condition did not affect Plaintiff's ability to see with respect to reading, depth perception, gross manipulation, fine detail, or the ability to use public transportation and drive vehicles. (*Id.*) Plaintiff's corrected visual acuity was 20/30 for the right eye, and 20/40 for the left eye. (R. 191.) Dr. Chechik also noted that Plaintiff's right eye was normal, and that his left eye had microaneurysms with no edema. (R. 192.)

On March, 25, 2005, Dr. Veena Gupta, a cardiologist, examined Plaintiff. (R. 208.) During the examination, Plaintiff's blood pressure was 170/100, and Dr. Gupta heard a soft systolic heart murmur. (*Id.*) An electrocardiogram, however, revealed no abnormalities. (*Id.*) Dr. Gupta ruled out coronary artery disease, and his impression was that Plaintiff suffered from diabetes mellitus, hypercholoesterolemia, and hypertension. (*Id.*) Dr. Gupta recommended a low calorie and low cholesterol diet. (*Id.*) He also scheduled a cardiac stress test, but Plaintiff failed to keep the appointment. (*Id.*)

In an undated note, Dr. Sangita Shah of Sheldon Medical Care observed that Plaintiff suffered from hypertension, diabetes mellitus, hyperlipidemia, glaucoma, right leg pain, backache, and a reported history of stroke. (R. 207.) In a form dated April 4, 2005, Dr. Shah

indicated that he had treated Plaintiff since January, 2005, and that Plaintiff had a blood pressure of 150/84. (R. 209.) In terms of Plaintiff's ability to perform work-related duties, Dr. Shah opined that Plaintiff was capable of performing light work duties, including lifting up to 20 pounds, and standing or walking for up to four hours at a time. (*Id.*)

On July 13, 2005, Dr. M. Metel, of Montefiore, wrote a note indicating that he had been Plaintiff's primary care physician for the past five months. (R. 205.) Dr. Metel observed that Plaintiff had "very uncontrolled diabetes mellitus, hypertension, and hyperlipidemia." (*Id.*) He also indicated that Plaintiff took medication to regulate his blood pressure and that he had started an insulin regiment to control his diabetes. (*Id.*)

On August 8, 2005, Dr. Metel completed a physician's report regarding Plaintiff's disability due to physical impairment and his ability to perform work-related functions. (R. 193-204.) Dr. Metel diagnosed diabetes, hyperlipidemia, and hypertension. (R. 193.) He also reported that Plaintiff's blood pressure at his last examination in July, 2005, was 130/80 and that Plaintiff did not suffer from any symptoms. (R. 203.) According to Dr. Metel, none of Plaintiff's medical conditions would be expected to cause pain. (R. 194.) He did note, however, that some of Plaintiff's medications could cause side effects such as dizziness. (R. 195.) With regard to Plaintiff's work-related functioning, Dr. Metel indicated that Plaintiff could, in an eight-hour work day, sit continuously for eight hours, stand continuously for eight hours, or walk continuously for eight hours. (R. 196.) He further opined that Plaintiff was capable of frequently lifting and carrying up to 20 pounds, and could occasionally lift up to 100 pounds. (R. 196-97.) Moreover, Dr. Metel found that Plaintiff could frequently bend, squat, crawl, climb, and reach. (R. 197.) He also noted that Plaintiff could frequently perform handling,

fingering, and pushing and pulling with his arms and hands. (R. 197-98.) Dr. Metel further

reported that Plaintiff would have no difficulty traveling alone to work on a daily basis and that

he did not suffer from any mental limitations. (R. 198, 200-01.)

## DISCUSSION

Defendant has moved for judgment on the pleadings on the ground that the

Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits was

supported by substantial evidence. (*See* Defendant's Memorandum of Law in Support of Her

Motion for Judgment on the Pleadings, at 11-18.) Despite the fact that Plaintiff was given ample

time to respond to the motion,[15] Plaintiff has neither responded to the motion, nor cross-moved.

Under the circumstances, this Court could recommend that Defendant's motion be granted on

default pursuant to Local Civil Rule 7.1. Nonetheless, as Plaintiff is proceeding *pro se,* the

Court has reviewed the administrative record and is making this recommendation on the merits.

*See Hufana v. Apfel*, No. 99 Civ. 3345 (FB), 2000 U.S. Dist. Lexis 12208, at *2 n.1 (E.D.N.Y.

Aug. 18, 2000); *Cortez v. Apfel*, No. 96 Civ. 7214 (AGS), 1998 U.S. Dist. Lexis 14179, at *1 n.2

(S.D.N.Y. Sept. 10, 1998).

### A.     Standard of Review

It is not the function of the reviewing court to determine *de novo* whether claimant is

disabled. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984). Rather, the Court must

examine the record to determine if the Commissioner's conclusions are supported by substantial

evidence. (*Id.*) Pursuant to the Act, the findings of the Commissioner as to any fact, "if

---

[15] On May 11, 2007, as Plaintiff had not responded to Defendant's motion for judgment on the pleadings, the Court set a deadline of June 15, 2007 for the Plaintiff to serve and file his opposition to Defendant's motion. (*See* Dkt. 12.)

supported by substantial evidence, shall be conclusive." *See Id.*, 42 U.S.C. § 405(g). Substantial

evidence has been defined as "more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

U.S. 389, 401 (1971) (internal quotations and citation omitted). Thus, where the Court finds that

substantial evidence exists to support the ALJ's determination, the decision will be upheld, even

if contrary evidence exists. *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990);

*DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) (decision affirmed where there was

substantial evidence for both sides). This standard applies to findings of fact as well as to

inferences and conclusions drawn from such facts. *See Levine v. Gardner*, 360 F.2d 727, 730

(2d Cir. 1966); *D'Amato v. Apfel*, No. 00 Civ. 3048 (JSM), 2001 U.S. Dist. LEXIS 9459, at *10

(S.D.N.Y. July 10, 2001).

Thus, the Court must review the ALJ's decision to determine whether the ALJ applied

the correct legal standard. *Tejada v. Apfel,* 167 F.3d 770, 773 (2d Cir. 1999). "'Where an error

of law has been made that might have affected the disposition of the case, this Court cannot

fulfill its statutory and constitutional duty to review the decision of the administrative agency by

simply deferring to the factual findings of the ALJ.'" *Townley*, 748 F.2d at 112 (quoting

*Wiggins v. Schweiker*, 679 F.2d 1387, 1389 n.3 (11th Cir. 1982)).

### B.     The Five-Step Procedure Prescribed by the Social Security Regulations

In order to establish entitlement to benefits under the Act, a plaintiff must establish that

he has a "disability." *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). The term

"disability" is defined as an "inability to engage in any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Balsamo*, 142 F.3d at 79. Moreover,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

In evaluating a claim for disability benefits, the ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits. *See* 20 C.F.R. §§ 404.1520, 416.920; *Diaz v. Shalala*, 59 F.3d 307, 312 n.2 (2d Cir. 1995); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam).

First, the ALJ must determine whether the claimant is engaged in substantial gainful activity. *See* 20 C.F.R. §§ 404.1520, 416.920. If not, the second step requires the ALJ to consider whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to do basic work activities. *Id*. If the claimant does suffer such an impairment, then the third step requires the ALJ to determine whether this impairment "meets or equals a listed impairment in Appendix 1" of the regulations. *Id*. If the claimant's impairment meets or equals one of those listed, the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience." *Id*. If the presumption does not apply, then the fourth step requires the ALJ to determine whether the claimant has the "residual functional capacity" to perform his "past relevant work." *Id*. An individual's residual functional capacity is his or her ability to do physical or mental work activities on a sustained basis despite

limitations from his or her impairments. 20 C.F.R. §§ 404.1545, 416.945. In making this determination, all of the claimant's impairments, including impairments that are not "severe," must be considered. *Id.* Under the procedure set out in the governing regulations, "[t]he claimant bears the initial burden of showing that his impairment prevents him from returning to his prior type of employment." *Berry,* 675 F.2d at 467 (citations omitted); *see also* 20 C.F.R. §§ 404.1520, 416.920. Finally, if the claimant cannot perform his past relevant employment, the Commissioner, in the fifth step, then has "'the burden of proving that the claimant still retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy.'" *Rosa v. Callahan,* 168 F.3d 72, 77 (2d Cir. 1999) (quoting *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)).

In making a determination by the five-step process, the ALJ must consider four sources of evidence: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotations and citation omitted).

In reviewing the medical evidence, the ALJ must give "controlling weight" to a treating physician's opinion, as long as the treating physician's "opinion on the issue(s) of the nature and severity of [the] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

**C.     The ALJ's Application of the Five-Step Procedure**

In this case, the ALJ, after proceeding through each of the steps listed above, determined that Plaintiff was not disabled.  (R. 13-18.)  First, the ALJ found that Plaintiff had not engaged in substantial gainful activity from May 19, 2003, the alleged onset date, through the date of the ALJ's decision.  (R. 17.)

At the second step of the sequential analysis, the ALJ concluded that Plaintiff's hypertension and diabetes were considered to be "severe" impairments under the regulations, meaning that such impairments significantly limited Plaintiff's ability to perform physical or mental work-related activities.  (R. 17; 20 C.F.R. §§ 404.1520(c), 416.921(c).)  The ALJ further concluded, however, that Plaintiff's visual impairment was not severe.  (R. 17; 20 C.F.R. §§ 404.1521, 416.921.)  Despite Plaintiff's claims of a visual impairment, the ALJ relied on the objective medical evidence and the opinion of Plaintiff's treating ophthalmologist, which showed that Plaintiff's corrected visual acuity was within a normal range.  (R. 15.)

At the third step, the ALJ found that Plaintiff did not suffer from an impairment that was medically equal in severity to the impairments listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  (R. 17.)  As the ALJ did not deem that Plaintiff's impairments met any of the impairments listed, the ALJ proceeded to the fourth step of the analysis, to assess Plaintiff's residual functional capacity.  At this step, the ALJ found that Plaintiff had the residual functional capacity to perform the full range of "light" and "medium" work.[16]  (R. 17.)  The ALJ further

---

[16] Medium work involves lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  20 C.F.R. §§ 404.1567(c), 416.967(c).  Light work requires lifting no more than 20 pounds at a time, with frequent lifting and carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in the light category when it involves a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  *Id*. at §§ 404.1567(b), 416.967(b).

concluded that Plaintiff retained the residual functional capacity to perform the demands of his past relevant work as a short-order cook as it is customarily performed because the job did not require exertional levels in excess of those found by the ALJ. (R. 15-18.) The ALJ did not find it necessary to reach the fifth step of the analysis.

The ALJ concluded that Plaintiff's subjective allegations were directly contradicted by the objective medical evidence and reports from numerous examining physicians. (R. 15.) Based on the divergence between Plaintiff's reported symptoms and the medical record, the ALJ found that Plaintiff had a tendency to exaggerate the extent of his symptoms and, for that reason, the ALJ discounted a great deal of Plaintiff's claims. (*Id.*) The ALJ ultimately concluded that Plaintiff had not been disabled as defined by the Act and regulations at any time from May 19, 2003 through the date of the ALJ's decision. (R. 18.)

**D.  Review of the ALJ's Decision**

Given that the ALJ followed the five-step procedure set forth in the Social Security regulations, this Court's review is limited to determining whether, in the course of following that procedure, the ALJ correctly applied the relevant legal principles, and whether his decision was supported by substantial evidence.

**1.  Substantial Evidence Supports the ALJ's Determination of the Severity of Plaintiff's Impairments.**

At the second step of the sequential analysis, the ALJ concluded that Plaintiff's hypertension and diabetes were considered to be "severe" impairments under the regulations. (R. 17; 20 C.F.R. §§ 404.1520(c), 416.920(c).)

The ALJ further concluded that Plaintiff's visual impairment was not severe under the regulations. This conclusion was based on substantial objective medical evidence from treating

physicians.  Dr. Chechik, one of Plaintiff's treating ophthalmologists, reported in December, 2004 that, although Plaintiff had a trace of diabetic retinopathy in his left eye, his corrected visual acuity was near normal.  (R. 15, 190.)  Dr. Chechik also opined that Plaintiff's condition did not result in any visual handicap or functional limitation.  (*Id*.)  The ALJ relied on Dr. Chechik's opinion and appropriately assigned controlling weight thereto.  (R. 15.)  The ALJ's decision is further supported by the opinion of Dr. Matusow, a second treating ophthalmologist, who similarly opined that, although Plaintiff suffered from diabetic retinopathy, the condition did not present a "visual disability."  (R. 164-65.)

The burden of demonstrating that an impairment or combination of impairments are medically severe rests with Plaintiff.  *See Yuckert*, 482 U.S. at 146 n.5.  Plaintiff having failed to meet this burden, the ALJ correctly concluded that Plaintiff's visual impairment was not medically severe under the regulations.  (R. 15.)

### 2. Substantial Evidence Supports the Conclusion That Plaintiff's Severe Impairments Did Not Medically Equal a Listed Impairment.

After determining that Plaintiff's diabetes and hypertension were "severe" impairments under the regulations, the ALJ proceeded to the third step of the disability analysis.  The ALJ found that Plaintiff's diabetes and hypertension did not, individually or in combination, medically equal in severity the impairments listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  (R. 17.)

In making this determination, the ALJ was required to consider whether the "symptoms, signs, and laboratory findings of [the claimant's] impairment(s) [were] equivalent in severity" to the "symptoms, signs, and laboratory findings of a listed impairment."  20 C.F.R. §§

404.1529(d)(3), 416.929(d)(3).  In this case, the ALJ omitted discussion of how he reached his

conclusion, stating only the following:

> The claimant's impairments do not meet or medically equal in
> severity the appropriate medical findings contained in 20 C.F.R
> Part 404, Appendix 1 to Subpart P (Listings of Impairments).

(R. 17).  Although this Court has held that "a determination by an ALJ must contain 'a sufficient

explanation of his reasoning to permit the reviewing court to judge the adequacy of his

conclusions,'" *Diaz v. Apfel*, 994 F. Supp. 541, 548 (S.D.N.Y. 1998) (quoting *Rivera v. Sullivan*,

771 F. Supp. 1339, 1354 (S.D.N.Y. 1991)), the ALJ's omission of a full analysis does not

preclude this Court from upholding his decision, provided the Court is convinced that the

ultimate conclusion is supported by substantial evidence on the record.  *Berry*, 675 F.2d at 468-

69; *see also Lusher ex rel. Justice v. Comm'r of Soc. Sec.*, No. 05 Civ. 1110 (DNH), 2008 U.S.

Dist. LEXIS 42403, at *6 (N.D.N.Y. May 29, 2008).

Here, there is simply no medical evidence that could support the conclusion that the

symptoms, signs, and laboratory findings related to either of Plaintiff's impairments were

equivalent to those of a listed impairment.  *See Diaz*, 994 F. Supp. at 549.  Hypertension, itself,

is not a listed impairment.  *See generally* 20 C.F.R. Part 404, App. 1 to Sub. P.  The regulations

provide that hypertension is to be evaluated "by reference to the specific body system(s) affected

(heart, brain, kidneys, or eyes) when [considering] its effects under the listings."  20 C.F.R. Part

404, App. 1 to Sub. P § 4.00(H)(1).  With respect to Plaintiff's heart, Dr. Gauthier found that

Plaintiff's echocardiogram did not confirm the possibility that Plaintiff suffered from

hypertensive heart disease (R. 174), and the record contains no evidence that Plaintiff's

hypertension had a detrimental effect on any of his other body systems.

Similarly, diabetes mellitus, in and of itself, is not a listed impairment. 20 C.F.R. Part 404, App. 1 to Sub. P § 9.08. In order to meet or equal one of the listed impairments, an impairment of diabetes mellitus must be accompanied by either (a) significant and persistent disorganization of motor function, (b) acidosis occurring at least once every two months, or (c) proliferative retinopathy (which is to be evaluated under the criteria for evaluating a visual impairment). *Id*.[17] There is no evidence in the record that Plaintiff's diabetes mellitus was accompanied by either condition (a) or (b), or that his trace retinopathy rose to the level of a severe visual impairment. *See supra*, Section D.1.

Thus, though the ALJ failed to provide a reasoned explanation for his step-three determination, this Court finds no evidence demonstrating that Plaintiff's hypertension and diabetes were medically equal to any impairment listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P, and concludes that the ALJ's determination is supported by substantial medical evidence.

### 3. Substantial Evidence Supports the ALJ's Determination That Plaintiff's Subjective Complaints of Pain Were Not Credible.

In his decision, the ALJ noted that Plaintiff had complained of "right leg pain" and "headaches for many years." (R. 15.) Citing the opinions of treating physician Dr. Metel and consultative physician Dr. Rocker, however, the ALJ discredited Plaintiff's testimony concerning these symptoms:

> The medical evidence could not reasonably substantiate the conclusion that the claimant has been so debilitated (for any continuous 12 month period) since May 19, 2003, his alleged onset date, that he is incapable of doing the prolonged

---

[17] Acidosis is "[a] derangement of the chemistry of the body in which the acid content of the blood is too high . . . or the bicarbonate content is too low." 1-A *Attorneys' Dictionary of Medicine* 1430. Proliferative retinopathy is "[a] disease of the retina marked by the growth of new and excessive blood vessels in the retina." 5-PR *Attorneys' Dictionary of Medicine* 1347.

standing/walking required in most Light and Medium jobs or that he lacks the strength to exert up to 20 pounds of force frequently . . . [and] to lift, carry, push, pull or otherwise move objects – a conclusion which is consistent with the clinical and laboratory findings in evidence. Overall, it appeared to the undersigned that the claimant had a tendency to exaggerate the extent of his symptoms. To that extent, the Administrative Law Judge has discounted a great deal of his report of symptoms.

(*Id.*).

"[S]tatements about [a claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled." 20 C.F.R. §§ 404.1529(a), 416.929(a). Nor shall the Commissioner "reject [the claimant's] statements about the intensity and persistence of [the claimant's] pain or other symptoms or about the effect [the] symptoms have on [the claimant's] ability to work . . . solely because the available objective medical evidence does not substantiate [the claimant's] statements." Rather, the Commissioner must consider "all of the available evidence," including the claimant's medical history, laboratory findings, statements from the claimant, the treating and nontreating physicians, and other persons about how the claimant is affected by pain, and the medical opinions of treating physicians. 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

It is not the function of this Court, however, "'to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant.'" *Aponte v. Secretary, Dep't of Health & Human Services*, 728 F.2d 588, 591 (2d Cir. 1984) (quoting *Carroll v. Secretary of Health and Human Services*, 705 F.2d 638, 642 (2d Cir. 1982)). Where an ALJ makes a credibility assessment and decides to discount a claimant's subjective complaints of pain, the reviewing court must defer to that credibility assessment, as long as the ALJ's findings are supported by substantial evidence. *Aponte*, 728 F.2d at 591.

In this case, the ALJ made a credibility assessment, determining that Plaintiff had "a tendency to exaggerate the extent of his symptoms," and the ALJ supported this determination

by comparison to the objective medical evidence. (R. 15.) *See Bomeisl v. Apfel*, No. 96 Civ. 9718 (MBM), 1998 U.S. Dist. LEXIS 11595, at *19 (S.D.N.Y. July 28, 1998) (noting that the ALJ's findings as to the claimant's credibility "are entitled to deference because the ALJ had the opportunity to observe the claimant's testimony and demeanor at the hearing").

Although the ALJ did not explain, in detail, his decision to discount Plaintiff's subjective complaints of pain, this Court finds, nonetheless, that his decision was supported by substantial evidence. *Berry*, 675 F.2d at 468-69; *Lusher*, 2008 U.S. Dist. LEXIS 42403, at *6 (holding that, if the court is convinced that an ALJ's ultimate conclusion is supported by substantial evidence on the record, the Court shall uphold the ALJ's determination).

.

Several apparent inconsistencies in Plaintiff's testimony give this Court reason to believe that the ALJ's credibility assessment is supported by substantial evidence. Plaintiff claimed that he suffered from poor vision and that, specifically, he was unable to see with his left eye and only "a little" with his right eye. (R. 219.) In spite of this, however, Plaintiff read the time on a clock on the wall without hesitation during his testimony. (R. 219.) Moreover, none of the medical evidence or the opinions of two ophthalmologists supported Plaintiff's claim of impaired vision. (R. 15, 164-65, 190.)

Plaintiff further claimed during the administrative hearing that he was unable to walk more than one-half block and that he could not travel alone. (R. 222.) This testimony, however, contradicted the opinion of Dr. Metel, Plaintiff's treating physician, who reported that Plaintiff would have no difficulty traveling alone to work (R. 198; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (providing that the opinions of treating physicians must be assigned "controlling weight")), and further contradicted the report of Dr. Rocker, who indicated that Plaintiff traveled alone to that examination. (R. 161.)

In addition, this Court notes that, based on the record, the strongest pain reliever ever prescribed to Plaintiff was Tylenol, a mild to moderate pain reliever ordinarily available without a prescription.  (R. 117; *see also* 6-TH-TY Attorneys' Dictionary of Medicine 1716 (indicating Tylenol for the treatment of "mild to moderate" pain).)  The record does not reflect that Plaintiff received any other treatment for the pain that he reported.  *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (providing that the factors relevant in weighing a claimant's subjective complaints of pain include the "type, dosage, [and] effectiveness . . . of any medication [a claimant] take[s] or ha[s] taken to alleviate [his] pain . . .; [and the] [t]reatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [his] pain").

Finally, Dr. Metel, Plaintiff's treating physician, reported that none of Plaintiff's medical conditions caused or could be expected to cause pain.  (R. 194; *see also* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (providing that the opinions of treating physicians must be assigned "controlling weight").)

### 4.    Substantial Evidence Supports the ALJ's Assessment of Plaintiff's Residual Functional Capacity to Perform "Medium" and "Light" Work.

Having found that Plaintiff's physical impairments were not medically equal in severity to the impairments listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P, the ALJ proceeded to the fourth step of the disability determination under the regulations.  The ALJ found that the Plaintiff had the residual functional capacity to perform a full range of light and medium work (R. 17), and therefore concluded that Plaintiff had the residual functional capacity to perform the duties of his past work as a short-order cook.  Although Plaintiff's hypertension and diabetes were found to be severe impairments (*see supra*), substantial medical evidence supported the

ALJ's findings that these impairments did not limit Plaintiff's residual functional capacity to perform his past relevant work.

As noted above, in reviewing the medical evidence, the ALJ must give "controlling weight" to a treating physician's opinion, as long as the treating physician's "opinion on the issue(s) of the nature and severity of [the] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Here, the ALJ's conclusion was supported by the opinion of Plaintiff's primary treating physician, Dr. Metel, as well as by the opinion of a consultative physician, Dr. Rocker, and a reviewing physician, Dr. Gauthier.

In August, 2005, Dr. Metel opined that Plaintiff had no limitations in his ability to sit, stand, or walk, in an ordinary eight-hour work day, on a regular and continuing basis. (R. 196.) He further indicated that Plaintiff could frequently lift and carry up to 20 pounds, and could occasionally lift up to 100 pounds in an eight-hour workday. (R. 196-97.) Dr. Metel also noted that Plaintiff could frequently bend, squat, crawl, climb, and reach in an eight-hour work day. (R. 197.)

Dr. Rocker, a consultative physician, and Dr. Gauthier, the reviewing physician, similarly concluded that Plaintiff did not have exertional restrictions that would prevent him from working. (R. 162-63, 171.) In Dr. Rocker's examination in August of 2003, he opined that Plaintiff was fully ambulatory and was capable of performing sedentary, light, and moderate work activity. (R. 163.) Dr. Gauthier concluded that there was no medical evidence to support Plaintiff's claims of exertional restrictions due to cardiac impairment. (R. 174.)

Plaintiff's testimony regarding his job duties as a short-order cook was consistent with the physicians' opinions of his abilities. (R. 217.) Plaintiff testified that his job involved mostly standing and occasional lifting of up to 50 pounds, which conforms with the requirements of medium work. (R. 217.) In a written report submitted to the Social Security Administration, Plaintiff indicated similar job responsibilities, also consistent with the elements of medium work. (R. 85-86.) Moreover, even if Plaintiff had demonstrated that he was no longer capable of performing his past relevant job of short-order cook as he had performed it, the Commissioner would merely have needed to show that Plaintiff was capable of performing the job as it was generally performed in the national economy. *Jock v. Harris*, 651 F.2d 133, 135 (2d Cir. 1981). The ALJ referred to the U.S. Department of Labor's Dictionary of Occupational Titles (4th ed. 1991) ("DOT") to define the general duties and exertional requirements of a short-order cook. (R. 16.) According to DOT, the job of a short-order cook consists of light work, while the job of a fast-food cook conforms with the requirements of medium work. *See U.S. Dep't of Labor, Dictionary of Occupational Titles*, §§ 313.374-014, 313.374-010 (4th ed. 1991). Thus, the two defined jobs that most clearly conformed to Plaintiff's previous relevant work are each within the work categories that Plaintiff's treating, examining, and reviewing physicians' assessed Plaintiff as capable of performing. (*See* R. 163, 193-96, 209.)

It is true that the record also contained the opinion of a nurse practitioner, suggesting that Plaintiff had limited residual functioning capacity. (R. 184-87; *see* 20 C.F.R. § 416.913(d)(1) (providing that information derived from nurse-practitioners and physicians' assistants may be used as evidence to show the severity of a plaintiff's impairment and how it affects his or her ability to work).) The presence of contrary evidence on the record, however, does not dictate a reversal where, as here, the ALJ's decision was supported by substantial evidence. *DeChirico*,

134 F.3d at 1182 (decision affirmed where substantial evidence existed on both sides). In this case, the ALJ reasonably relied on the medical reports of multiple physicians to support his conclusion that Plaintiff was not disabled, and correctly gave controlling weight to the opinion of Dr. Metel. *See Richardson*, 402 U.S. at 401; 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

In sum, the ALJ's determination at the fourth step of his analysis that Plaintiff had the residual functional capacity to perform his past work, and therefore was not entitled to disability benefits, is supported by substantial evidence.

## CONCLUSION

As substantial evidence supports the ALJ's findings of fact and no prejudicial legal errors were made, I respectfully recommend that Defendant's motion for judgment on the pleadings be granted, and the decision of the Commissioner be affirmed.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Laura T. Swain, United States Courthouse, 500 Pearl Street, Room 1610, New York, NY 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, NY 10007. Any requests for an extension of time for filing objections must be directed to Judge Swain. FAILURE TO OBJECT WITHIN TEN (10) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d

1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v.*

*Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d

Cir. 1983).

Dated: New York, New York
October 31, 2008

Respectfully submitted,

_____
DEBRA FREEMAN
United States Magistrate Judge

Copies to:

Hon. Laura T. Swain, U.S.D.J.

Mr. Jorge Cruz
2285 Andrews Ave., Apt. 1F
Bronx, NY 10468

John E. Gura, Jr., Esq.
Assistant U.S. Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007